UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

Christina Bobbin, in her capacity
as Plenary Guardian of Carlo
Daniel Laudadio, an incapacitated
adult,

Civ. No. 2:14-158-FtM-PAM-MRM

Plaintiff,

v.

**MEMORANDUM AND ORDER**

Corizon Health, Inc., formerly
known as Prison Health Services,
Inc.; Natalia Saunders, H.S.A.;, Janice
Stepnoski, L.C.S.W; Walter Carl
Morris, R.N.; Noel Dominguez, M.D.;
Andrew Paul Safron III, D.O.; Svoboda
Maria Holt, L.M.H.C.; and Janet Joan
Memoli, R.N.;

Defendants.

_____

This matter is before the Court on Defendants' Motion for Summary Judgment,

Plaintiff's Motions to Exclude Expert Witnesses, and Plaintiff's Motions for Sanctions.

For the following reasons, the Motion for Summary Judgment is granted in part and

denied in part, the Motions to Strike Expert Witnesses are denied, and the Motions for

Sanctions are denied.

## BACKGROUND

On October 19, 2011, while in custody at the Lee County Jail, Carlo Daniel

Laudadio hung himself with his jumpsuit.  (Aug. 11, 2015, Order (Docket No. 104) at 3.)

He did not succeed in killing himself, but he is now confined to a wheelchair and

mentally incapacitated.  (Id. at 4.)  His sister, Christina Bobbin, was appointed his legal guardian and in that capacity brought this lawsuit.  (Id.)

Laudadio had been arrested on October 14, a Friday, for a violation of his probation.  (Id. at 3.)  Nurse Karen Delacey[1] placed Laudadio on suicide watch in the direct-observation unit of the jail, because he stated during intake that he was suicidal or had recently been suicidal.  (Defts.' Ex. 12 (Laudadio's Jail Medical Record) at 6; see also id. Ex. 1 (Corizon Policy) at 16-18.)  Indeed, Laudadio had been confined pursuant to a Baker Act hold in September 2011, and at that time the mental-health unit psychologist prescribed him antipsychotic medication.  (Id. Ex. 4 (Sarmiento Dep.) at 21, 23.)  On Sunday, October 16, however, the jail's Mental Health Director, Jane Stepnoski, released Laudadio from suicide watch.  (Compl. ¶¶ 42-43.)  He was not transferred to the general population, but was sent to the infirmary for detoxification from drugs.  (Defts.' Ex. 12 at 14.)  At no point during his October incarceration was he given the prescribed antipsychotic medication, even after his detox program was complete.

Bobbin contends that Corizon policy required both that Laudadio undergo a mental health evaluation before he was released from suicide watch and also that he be examined every day after his release from suicide watch.  According to Bobbin, Stepnoski did not conduct any mental health evaluation for Laudadio, and in fact a mental health professional never examined Laudadio during his time at the jail. Defendants claim that Stepnoski did examine Laudadio on October 16, the day she

---

[1] Delacey was named as a Defendant but has been dismissed by stipulation of the parties. (Docket No. 75.)

cleared him from suicide watch, and that Dr. Noel Dominguez, a Corizon physician, also examined him on October 18. But the mental health roster logbook from the jail has disappeared, so it is not possible to verify either side's claims in this regard. And the daily event logs for the unit do not show Stepnoski coming onto the direct-observation unit on either October 15 or 16.[2]   (Saunders Dep. Ex. 21 (Docket No. 106-4).)   In addition, Stepnoski's alleged mental health evaluation form and notes from her examination of Laudadio were not put into Laudadio's file until two months after the event, although Defendants produced Laudadio's file to Bobbin in this litigation as if the exam notes had been there all along. Defendants did not admit that the exam notes were inserted into the file months after the incident until after lengthy discovery motion practice revealed that was the case.

After Laudadio's release from suicide watch, Defendant Janet Memoli, R.N., conducted an intake screening for Laudadio's admission to the infirmary. (Defts.' Ex. 12 at 8.) She marked "yes" to the question "do you have thoughts of hurting yourself?" (Id.) She left the question, "are you thinking about suicide right now?" unmarked. (Id.) In her deposition, Memoli asserted that she would have sent Laudadio back to suicide

---

[2] By contrast, the daily event logbook for the female direct-observation unit at the jail shows that Stepnoski was on that unit from 9:30 am to 9:50 am on October 16. (Docket No. 106-9.) During that 20 minutes, she ostensibly cleared seven female inmates from suicide watch, despite Corizon's patient safety officer's testimony that a full, face-to-face mental health evaluation was required to clear an inmate from suicide watch. (Haggard Dep. (Docket No. 210-4) at 21-22.) Stepnoski herself testified that a full mental health evaluation takes at least 15 minutes and up to 45 minutes. (Stepnoski Dep. (Docket No. 106-5) at 41.) And Stepnoski's mental health evaluation for Laudadio indicates that it was completed at 9:45 am on October 16, when she was not on the male unit but rather was on the female unit. (Docket No. 106-7 at 2-5 (Oct. 16, 2011, Mental Health Evaluation form for Laudadio).)

watch if he had answered "yes" to the second question.  (Memoli Dep. (Docket No. 184-7) at 64-72.)

On October 19, Laudadio refused to leave the shower room and a Deputy pepper-sprayed him.  (Docket No. 106-6 at 39 (Oct. 19, 2011, Nursing Evaluation Tool: Use of Force).)  Deputies returned Laudadio to the shower for decontamination and allowed him to enter the shower room alone.  Defendant Walter Morris, the nurse on duty, medically cleared Laudadio from the pepper spray not by examining him personally, but by concluding that, because he could hear Laudadio yelling in the shower, the pepper spray had not caused Laudadio respiratory distress.  (Docket No. 106-6 at 39 (Oct. 19, 2011, Nursing Evaluation Tool: Use of Force); Morris Dep. (Docket No. 184-3) at 64-65.) Another inmate asserts that he urged corrections officers to check on Laudadio but they ignored him.  (Chipperfield Aff. (Docket No. 206-1) ¶ 15.)  After approximately 30 minutes, officers found Laudadio hanging in the shower.  (Id. ¶ 16.)

The Second Amended Complaint (Docket No. 50) raises 10 claims against Corizon and its employees (the "Medical Defendants").  Count I raises a vicarious liability medical negligence claim against Corizon for the allegedly negligent actions of its employees.  Count II is a claim against Corizon for neglect of a vulnerable adult in violation of Fla. Stat. § 415.1111.  Count III alleges that Stepnoski, Maria Holt, and Natalia Saunders were negligent in failing to ensure that Laudadio had appropriate mental-health follow-up care after he was released from suicide watch.  Count IV asserts a statutory vulnerable-adult claim against Stepnoski, Holt, and Saunders.  Count V claims medical negligence against Morris, the nurse who cleared Laudadio after the pepper

4

spray, Dr. Andrew Safron, and Nurse Memoli.  Count VI asserts a statutory vulnerable-adult claim against Morris, Dr. Noel Dominguez, Dr. Safron, Holt, and Memoli.  Count IX[3] raises a § 1983 claim against all Medical Defendants for deliberate indifference to Laudadio's serious medical and mental-health needs.  Count X alleges supervisory § 1983 liability against Corizon and Stepnoski for alleged failure to train, supervise, and take corrective measures.  Count XI asserts that Corizon's practice of understaffing and its custom of allowing its employees or corrections officers to use excessive force against mentally ill inmates caused the violation of Laudadio's constitutional rights, and Count XII claims a similarly unconstitutional policy of delaying or denying the provision of adequate mental health care to inmates.  The Complaint initially named as Defendants the Sheriff and two Deputies who worked at the jail, but those Defendants have been dismissed by stipulation of the parties.  (Docket No. 266.)

Defendants seek summary judgment on all counts.  Bobbin concedes that Count XI, alleging a policy of excessive force, should be dismissed, but opposes summary judgment as to the remaining claims.  In addition, Bobbin seeks the exclusion of two of Defendants' expert witnesses, and sanctions against Defendants for the missing roster logbook as well as Stepnoski's late-filed evaluation report.

**DISCUSSION**

Summary judgment is proper only if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a);

---

[3] Count VII was dismissed by previous Order.  (Docket No. 49.)  Count VIII raised claims only against the Sheriff and Deputies.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  When opposing a motion for summary judgment, the nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials and must do more than simply show that there is some metaphysical doubt as to the material facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## A.      § 1983 Claims

### 1.      Corizon

Under 42 U.S.C. § 1983, Corizon may be liable for the allegedly unconstitutional conduct of its employees only to the extent that Corizon maintained a policy, custom, or practice that was a moving force of the alleged constitutional deprivation.  Monell v. Dep't of Social Servs., 436 U.S. 658, 690 (1978); Buckner v. Toro, 116 F.3d 450 (11th Cir. 1997) (Monell applies to private corporations performing traditional public functions).

The basis for Bobbin's <u>Monell</u> claims against Corizon is less than clear.  She seems to argue that Corizon knew that its mental health employees were not doing the required mental health evaluation checks, that Corizon encouraged its mental health employees not to give inmates previously prescribed medication, and that Corizon purposely understaffed the units.  But she has little evidence to support most of these claims.

There is insufficient evidence before the Court that Corizon maintained any sort of custom or policy to not give inmates their prescription medications. Similarly, the only evidence regarding staffing issues is Memoli's resignation from Corizon.  Memoli resigned after an October 12, 2011, staff meeting where staff reductions were discussed. In her resignation, she stated that the reductions would impact patient safety.  But Bobbin has no evidence that the alleged reductions had taken effect by October 19, or that having any more staff would have prevented the alleged violations of Laudadio's constitutional rights in any event.  Her <u>Monell</u> claims as to these alleged policies or customs fail.

Bobbin has, however, raised a genuine issue of fact as to whether Corizon either encouraged or did not discourage its mental health employees, like Stepnoski, to conduct cursory mental-health evaluations of inmates before releasing them from suicide watch. This claim survives summary judgment.

## 2.    Individual Defendants

To establish the individual Defendants' liability under § 1983, Bobbin must show that Laudadio had an objectively serious medical need and each Defendant deliberately disregarded that need.  <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004).  A

violation of § 1983 requires more than mere negligence.  Estelle v. Gamble, 429 U.S. 97, 106 (1976).

As to most of the individual Defendants, Bobbin's allegations amount to negligence at best, and do not establish deliberate indifference.  For example, Dr. Safron, the jail's staff psychiatrist, was supposed to have examined Laudadio.  The records show that although Safron was present at the jail at the same time as Laudadio, he did not ever examine Laudadio.  There is no evidence that Dr. Safron was aware that Laudadio was having any sort of mental health issue or crisis.  Bobbin does not explain how Safron's failure to examine Laudadio, without more, amounts to deliberate indifference.

Similarly, Bobbin faults Dr. Dominguez for not noticing that a mental health evaluation was absent from Laudadio's medical chart.  Dr. Dominguez is a medical doctor, not a psychiatrist.  Bobbin also argues that Dr. Dominguez should have coordinated with the mental health unit to ensure that Laudadio was receiving his antipsychotic medication.  Again, this is at most negligence, not deliberate indifference. Drs. Safron and Dominguez are therefore dismissed from Count IX.

Bobbin makes no specific argument regarding the § 1983 liability of Defendants Svoboda Holt or Natalia Saunders, and these Defendants are likewise dismissed from Count IX.

As to Stepnoski, Morris, and Memoli, however, Bobbin's § 1983 deliberate-indifference claim succeeds.  Bobbin has raised a fact question as to whether Stepnoski either cursorily examined or altogether failed to examine Laudadio before releasing him from suicide watch.  She has also raised a question of fact as to whether Morris failed to

follow Corizon policy regarding clearing an inmate after pepper-spraying and was deliberately indifferent to Laudadio's serious medical needs as a result, and whether it was deliberately indifferent for Memoli to fail to follow up on Laudadio's statement that he was considering or had considered suicide.  Should Bobbin establish these facts at trial, a reasonable jury could find each of these Defendants deliberately indifferent.

### 3.    Supervisory Liability

In Count X, Bobbin raises a § 1983 claim against Corizon and Stepnoski for alleged failures to train and/or supervise and alleged failures to take corrective measures. Although Defendants ostensibly seek summary judgment on this Count, they make no specific argument regarding this claim.  Summary judgment on Count X is therefore denied.

### 4.    Policy of Delaying or Denying Mental Health Care

Count XII alleges that Corizon maintained a policy of delaying or denying mental health care to inmates at the Lee County Jail.  Defendants argue that Bobbin has failed to point to any such policy, custom, or practice, and that her claims regarding alleged policies therefore fail.  Bobbin does not specifically address this claim in her opposition to the Motion, and the Court has found no evidence in the record to support this claim. Summary judgment on Count XII is therefore appropriate.

## B.    Medical Negligence

Defendants argue that the Court should dismiss Bobbin's medical-negligence claims because her medical expert does not meet the requirements of Florida law, which

requires medical experts to have practiced in the last five years.[4]  It is undisputed that

Bobbin's expert, Dr. Roberta Stellman, has not practiced medicine since 2008.

But the statute at issue does not bar Dr. Stellman's testimony.  The statute requires

that the expert have "devoted professional time during the 5 years immediately preceding

the date of the occurrence that is the basis for the action" to practice or teaching.  Fla.

Stat. § 766.102(5)(b).  The occurrence here was in 2011.  Dr. Stellman last practiced in

2008.  She can testify as Bobbin's medical expert.

Defendants also contend that Laudadio's actions were not foreseeable, making a

negligence claim untenable.  But there is at least a question of fact as to foreseeability

here.  Bobbin has proffered evidence that Laudadio had been incarcerated at the Lee

County Jail several times before and each time he had professed a desire to kill himself or

had a history of recent suicide attempts.  And even if Defendants were not on notice by

reason of previous encounters with Laudadio, there is evidence that he was acting

irrationally and that he had admitted to suicidal thoughts.  This is enough to create a

genuine issue of fact as to whether some Defendants were negligent in their care.

However, as with the § 1983 claim discussed above, Bobbin has presented no

specific evidence that Holt or Saunders were negligent.  They are therefore dismissed

from Count III.

---

[4] Bobbin contends that her negligence claim against Stepnoski and Holt, Count III, does not sound in medical negligence.  As Defendants note, however, Bobbin has consistently described Count III as a medical negligence claim.  She cannot change course at this late stage of the litigation.

C.   **Vulnerable Adult**

Finally, Defendants argue that summary judgment on Counts II, IV, and VI is appropriate.  These Counts allege a violation of Florida's vulnerable-adult statute, which provides a civil action against a caregiver who fails to appropriately care for a vulnerable individual.  Fla. Stat. § 415.111  Defendants contend that Laudadio was not a vulnerable adult under Florida law because there is no evidence that he was unable to perform the activities of daily living.  The statute defines vulnerable adult as a person over the age of 18 "whose ability to perform the normal activities of daily living or to provide for his or her own care or protection is impaired due to mental, emotional, long term physical or developmental disability or dysfunction, brain damage or the infirmities of aging."  Id. § 415.102(27).

Defendants' focus on the "activities of daily living" part of the statutory definition is misplaced.  The statute provides that an adult may be vulnerable because of an inability to perform normal activities or to provide for his own care and protection.  A mentally ill, suicidal individual is certainly one who is unable to provide for his own protection.

But there is a more significant problem with Bobbin's invocation of this statute. The vulnerable adult statute is not "an alternate cause of action for medical negligence." Bohannon v. Shands Teaching Hosp. & Clinics, Inc., 983 So. 2d 717, 721 (Fla. 2008). Bobbin's claims sound in medical negligence, and as such do not state a claim under the vulnerable adult statute as a matter of law.  Those counts are therefore dismissed.

11

**D.     Motions to Exclude Expert Witnesses**

Bobbin seeks to exclude two of Defendants' expert witnesses:   Dr. Arthur Fournier, M.D., and Dr. Joseph Penn, M.D.   Bobbin contends that these experts reviewed documents after submitting their reports but did not supplement their reports to reflect those newly reviewed documents.   But Fournier at least testified that his opinions did not change after reviewing the allegedly new materials.   Moreover, it appears that Bobbin's complaint is not that the experts failed to supplement their reports, but that they failed to address Bobbin's theory that Stepnoski created Laudadio's mental health evaluation after the fact, to cover her tracks.

<u>Daubert</u> does not impose an obligation on Defendants' experts to consider every theory Bobbin raises, however.   At best, Bobbin's arguments go to the witnesses' credibility, not to whether they should be allowed to testify in the first instance.   If the experts indeed ignored relevant evidence, rendering their opinions untrustworthy, Bobbin can effectively cross-examine them.   Her Motions to exclude these experts are denied.

**E.     Motion for Sanctions/Adverse Inference**

Bobbin seeks sanctions and an adverse-inference instruction for Defendants' failure to preserve the jail's Mental Health Roster Log for October 2011.   Bobbin contends that Defendants were on notice by early November 2011 that there would be litigation regarding Laudadio's attempted suicide, and their failure to preserve the log book for October constitutes spoliation of evidence.   Bobbin further argues that the spoliation was in bad faith and that sanctions are therefore appropriate.   She requests

sanctions against Defendants in the form of either denial of Defendants' Motion for Summary Judgment or an adverse inference at trial.

"Spoliation is established where the moving party demonstrates (1) the missing or destroyed evidence existed at one time, (2) the non-moving, allegedly spoliating party had a duty preserve the evidence, and (3) the allegedly spoliated evidence was <u>crucial</u> to the movant's ability to prove a <u>prima facie</u> case or defense." <u>QBE Ins. Corp. v. Jorda Enters., Inc.</u>, 280 F.R.D. 694, 696 (S.D. Fla. 2012). Sanctions are available only if the spoliating party acted in bad faith. <u>Bashir v. Amtrak</u>, 119 F.3d 929, 931 (11th Cir. 1997). Bad faith may be established by evidence that the spoliating party knew or should have known of its duty to preserve the evidence and there is no credible explanation for the missing evidence. <u>Managed Care Solutions, Inc. v. Essent Healthcare, Inc.</u>, 736 F. Supp. 2d 1317, 1323 (S.D. Fla. 2010).

Defendants contend that the log book is actually a Sheriff's Office record, and because Corizon's contract with the Sheriff's Office ended in 2013, Corizon had no ability to preserve or access this record. But Corizon was still the Sheriff's Office's medical provider in November 2011 when litigation was first threatened, and it had an obligation as of that date to preserve whatever evidence it had regarding Laudadio's treatment at the jail. Given that multiple Corizon witnesses reference the logbook, Corizon's insistence that the logbook would be unhelpful to Bobbin's case is not particularly persuasive. Because the logbook apparently no longer exists, it is not Bobbin's burden to prove that it would have helped her case.

13

The parties' briefing has conflated the logbook issue with myriad other discovery issues that have arisen in this contentiously litigated case, making the briefs singularly unhelpful to the Court's decision on this issue.  For the purposes of this Motion, however, Bobbin has established the elements of her spoliation claim.  She has also proferred evidence which, if true, could establish Corizon's bad faith.

An adverse inference instruction may be appropriate, but whether such an instruction is given will depend on the evidence adduced at trial.  Other sanctions are not warranted.  This Motion is thus denied without prejudice to argument at trial.

## F.    Motion for Sanctions and to Strike Answer

In this Motion, Bobbin seeks sanctions for the allegedly misfiled mental health evaluation and other discovery issues.  But despite Bobbin's rhetoric, there is no evidence in the record that Corizon or Stepnoski fabricated the mental health evaluation after the fact.  Certainly, Bobbin can discuss the mysteriously reappearing form with her witnesses and bring that issue before the jury.  The jury can make its own determination about the legitimacy of the late-filed form.  But Bobbin is not entitled to sanctions on this issue or on the other discovery issues about which she complains.  This Motion is denied.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED that**:

1.    Defendants' Motion for Summary Judgment (Docket No. 191) is **GRANTED in part** and **DENIED in part**;

2.    Counts II, IV, VI, XI, and XII of the Second Amended Complaint (Docket No. 50) are **DISMISSED with prejudice**;

3.     All claims against Defendants Holt, Saunders, Safron, and Dominguez are

       **DISMISSED** and the Clerk is directed to **TERMINATE** those Defendants

       from this action;

4.     Plaintiff's Motions to Strike Defendants' expert witnesses (Docket Nos.

       187, 188) are **DENIED**;

5.     Plaintiff's Motion for Sanctions and Adverse Inference (Docket No. 238) is

       **DENIED without prejudice**; and

6.     Plaintiff's Motion for Sanctions and to Strike Answer (Docket No. 249) is

       **DENIED**.


Dated:  January 11, 2017

                                          _s/Paul A. Magnuson_
                                          Paul A. Magnuson
                                          United States District Court Judge